**FILED**
**CLERK**

9/28/2012 12:42 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
DISH NETWORK L.L.C., ECHOSTAR
TECHNOLOGIES L.L.C. AND NAGRASTAR
LLC,

                  Plaintiffs,

          -against-

WORLD CABLE INC., d/b/a
www.worldcable.tv, PREMIUM
HOSTING.NET INC., STATEWIDE
MANAGEMENT HOLDING, INC., SAJID
SOHAIL, YASMINE MALIK, SHAHID
RASUL A/K/A "BOB RASUL" and JOHN and
JANE DOES 1-5,

                  Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
11-CV-5129 (ADS)(WDW)

<u>**APPEARANCES:**</u>

**Kenney Shelton Liptak Nowak**
*Attorneys for the plaintiffs*
14 Lafayette Square
510 Rand Building
Buffalo, NY 14203
      By: James S. Nowak, Esq., Of Counsel

**Green, Miles, Lipton & Fitz-Gibbon, LLP**
*Attorneys for the plaintiffs*
77 Pleasant Street
P.O. Box 210
Northhampton, MA 01061
      By: John M. McLaughlin, Esq., Of Counsel

**Law Offices of Patrick J. Sullivan, PLLC**
*Attorneys for the defendants*
92 Willis Avenue, Second Floor
Mineola, NY 11501
     By: Patrick J. Sullivan, Esq., Of Counsel

1

**SPATT, District Judge**.

On July 17, 2009, Plaintiffs DISH Network, L.L.C. ("DISH Network"), EchoStar Technologies L.L.C. ("EchoStar"), and NagraStar L.L.C. ("NagraStar" and together with DISH Network and EchoStar, "the Plaintiffs") commenced this action against Defendants World Cable Inc., d/b/a www.worldcable.tv ("World Cable"), Premium Hosting.Net Inc. ("Premium Hosting"), Statewide Management Holding, Inc. ("Statewide"), Sajid Sohail ("Sohail"), Yasmine Malik ("Malik"), and Shahid Rasul a/k/a "Bob Rasul" ("Rasul" and collectively "the Defendants"), alleging violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"), the Communications Act of 1934, 47 U.S.C. § 605 ("the Communications Act"), and New York state law. Presently before the Court is a motion by the Defendants pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss the DMCA and Communications Act causes of action for failure to state a claim, and a motion by the Plaintiffs pursuant to Fed. R. Civ. P. 15(a) to amend the complaint. For the reasons set forth below, the Court grants the Defendants motion to dismiss the complaint. In addition, the Court grants in part, denies in part, and reserves decision in part with respect to the Plaintiffs' motion to amend.

## I. BACKGROUND

### A. Factual Background

The following facts are drawn from the Plaintiffs' proposed second amended complaint. For purposes of this motion to dismiss and motion to amend, the Court accepts all well-pleaded, nonconclusory factual allegations as true and treats them in the best light for the Plaintiffs. See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949–50, 173 L. Ed. 2d 868 (2009); Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009).

Plaintiffs DISH Network, EchoStar, and NagraStar operate various elements of the DISH Network satellite television distribution system. DISH Network is a satellite television company that delivers hundreds of channels with movies, sports, and general entertainment services to subscribers who pay a fee to receive such services. EchoStar designs and delivers to DISH Network subscribers the equipment necessary to receive DISH Network satellite programming services, including a small satellite DISH antenna and an integrated receiver/decoder (the "EchoStar receiver"). NagraStar provides smart cards and other technology that are included in a DISH Network customer's EchoStar receiver. Through the use of the EchoStar receiver and the NagraStar smart card, DISH Network is able to control what programming subscribers can receive based on their subscriptions.

DISH Network contracts for and purchases the distribution rights for the copyrighted programming it broadcasts from a number of different outlets, including content providers from outside the United States. Relevant to the instant case, DISH Network has entered into agreements whereby it obtained the rights to distribute the content from the following twelve South Asian channels through its satellite signals to its subscribers in the United States: "ARY DIGITAL", "ARY ONE (NEWS)", "ATN BANGLA", "CHANNEL I", "DAWN NEWS", "EKHUSEY", "EXPRESS NEWS", "GEO TV", "GEO NEWS", "HUM", "PTV", and "TV ONE" (the "subject channels"). With respect to four of those channels, "ARY DIGITAL", "ARY ONE (NEWS)", "ATN BANGLA", and "GEO NEWS", DISH Network has agreements giving it the exclusive rights to broadcast the programming ("the exclusive rights channels").

DISH Network utilizes the following "conditional access system" to provide security for the DISH Network satellite signal ("the DISH signal") and therefore protect the content on the subject channels from unauthorized viewing. First, DISH Network digitally compresses and

3

digitizes its satellite television programming and then encrypts (electronically scrambles) it before transmitting it to its customers. This encrypted DISH signal is then transmitted to satellites above the Earth; transmitted back down to customer's satellite dish antenna; and then relayed by a cable wire to the customer's EchoStar receiver. Finally, the NagraStar smart card works with the EchoStar receiver to decrypt or descramble the encrypted DISH signal. Through the use of the conditional access system, DISH Network can restrict access to its signals to its paying subscribers.

Defendant World Cable is a New York corporation that operates a telecommunications distribution company through the website www.worldcable.tv. World Cable operates a television signal distribution business in the New York City/Long Island area, which distributes television signals through an Internet Protocol Television ("IPTV") system. Through these signals, World Cable transmits to its subscribers approximately 130 channels, many of which originate in South Asia. To obtain access to the World Cable IPTV system, subscribers pay a monthly subscription fee and purchase a set top box ("the World Cable box"). As described by the Plaintiffs:

> The World Cable box is designed to make a direct-to-server internet connection with the World Cable server. Once connected to the World Cable server, the World Cable box streams the video channels from the server directly onto subscriber's television set. The subscriber can then utilize a remote control tied to the World Cable box to switch channels and watch programming in real-time, almost as if the subscriber were watching the commensurate satellite television feed for the real-time programming.

(PSAC, ¶ 35.)

According to the Plaintiffs, defendant Premium Hosting, also a New York corporation, is one of the web-hosting companies that effectuates the direct-to-server connection between the World Cable boxes and the World Cable server. Defendant Shahid Rasul is the chairman or

4

chief executive officer and the principal executive officer of World Cable and the president of Premium Hosting.

At an unspecified time, DISH Network entered into the following subscription agreements that establish DISH Network accounts with the following individual defendants, who the Plaintiffs allege were undisclosed agents or employees of World Cable ("the individual accounts"):

- a commercial subscriber agreement with defendant Statewide Management Holding Inc., which authorized the receipt of DISH Network programming at a commercial location specified on the account, 1983 Marcus Avenue, North New Hyde Park, Nassau County, NY 11042 ("the Statewide account"). This address is also the business address for World Cable. In addition, defendant Sajid Sohail is the chairman or chief executive officer of Statewide. In association with this account, Statewide had five separate EchoStar receivers that were listed as active on the account, bearing serial numbers: R0080381823; R0081455994; R0078855235; R0078988218; and R0073393471.

- two residential subscriber agreements with Sajid Sohail. Sohail's first agreement with DISH Network authorized the receipt of DISH Network programming at the residential location specified on the account, 270 I U Willets, Road, Albertson, Nassau County, NY 11507 ("Sohail's first account") and the second agreement limited the receipt of DISH Network programming to the allegedly non-existent residential address located on the account, 270 I U, #U, Willets Road, Albertson, NY 11507 ("Sohail's second account"). Three separate Echostar receivers were associated with Sohail's first account, bearing serial numbers R0053416600; R0038531642; and R0035527026, and two separate EchoStar receivers were associated with Sohail's second account, bearing serial numbers R0064424827 and R0066742196.

- a residential subscriber agreement with Yasmine Malik, which authorized receipt of DISH Network programming at the residential location specified on the account, 226 Floral Avenue, Plainview, NY 11803 ("the Malik account"). According to the Plaintiffs, although her account remained active as of December 1, 2011, Malik no longer resided at the residential address listed in the agreement. Three separate EchoStar receivers were associated with the Malik account bearing serial numbers: ROI09658475; ROI09608463; and ROI09722637.

- a residential subscriber agreement with Shahid Rasul, which authorized the receipt of DISH programming at the allegedly non-existent address 272 I U Willets Road, Albertson, New York 11507 ("the Rasul account"). Three separate EchoStar receivers were associated with the Rasul account, bearing serial numbers: R0080504930; R0080052849; and R0083273667.

According to the Plaintiffs, in entering into these subscription agreements, Statewide, Sohail, Malik and Rasul agreed to view the programming only at the address associated with their particular account, and agreed not to re-broadcast or transmit the DISH Network signals. However, at an unspecified time, the Plaintiffs conducted an undercover investigation and allegedly determined that: (1) at least as of December 1, 2011, and for some time prior to that date, the EchoStar receivers associated with the individual accounts were not located at the addresses associated with the accounts and (2) the subject channels were being routed from the individual accounts and re-broadcast through the World Cable IPTV distribution system ("the re-broadcasting scheme"). According to the Plaintiffs, all of the EchoStar receivers were fully integrated into the World Cable system and actively being utilized to effectuate the unauthorized re-broadcasting of the Plaintiffs' subject channels. In addition, the Plaintiffs allege that certain EchoStar receivers were utilized by World Cable in the unauthorized distribution of DISH Network's exclusive rights channels.

**B. Procedural History**

On October 21, 2011, the Plaintiffs filed a complaint alleging that the Defendants' alleged re-broadcasting scheme violated the DMCA and the Communications Act. In addition, the Plaintiffs asserted claims under New York state law against all of the Defendants for unjust enrichment, conversion, and unfair competition, as well as claims against Statewide, Sohail, and Malik for breach of contract. In conjunction with the complaint, the Plaintiffs filed an *ex parte* motion for a temporary restraining order ("TRO"). On October 29, 2011, the Court granted the Plaintiffs' motion for a TRO, which included an order for the Civil Seizure of certain items including the EchoStar receivers associated with the individual accounts.

On December 1, 2011 the United States Marshals, with the assistance of the Plaintiffs' personnel, executed this Court's Civil Seizure order. Pursuant to the Court's order, defendant Sohail provided an agent of the Plaintiffs with: (1) all five of the EchoStar receivers associated with the Statewide account; (2) the two EchoStar receivers associated with Sohail's second account; (3) all three of the EchoStar receivers associated with the Malik account; and (4) two of the three EchoStar receivers associated with the Rasul account. According to the Plaintiffs, the third EchoStar receiver associated with the Rasul account was discovered at the address listed on Sohail's first account and was found connected to and feeding signals into an internet connection. In addition, the Plaintiffs allege that the three EchoStar receivers associated with Sohail's first account were not surrendered or recovered.

On December 7, 2011, the Plaintiffs filed their first amended complaint, which amended the complaint to correct the address of defendant Malik; to set forth the business address for World Cable; and to assert that Shahid Rasul utilized the alias "Bob Rasul".

On January 11, 2012, the Defendants moved to dismiss the DMCA and the Communications Act causes of action in the first amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Specifically, the Defendants moved to dismiss the DMCA claims on the ground that the Plaintiffs had failed to adequately plead that they, or the World Cable boxes, "circumvented" any technological measure. In addition, because the Plaintiffs had only argued in conjunction with the TRO that the Defendants were liable for violating the first sentence of § 605(a) of the Communications Act, the Defendants similarly limited their motion to dismiss the Communications Act claim, arguing that, because they were not "communications personnel", they could not be held liable under the first sentence of § 605(a). Finally, the Defendants did not attack the sufficiency of the allegations underlying the state law claims

directly, but rather argued that, if the Court dismissed the federal claims, the Court should decline to exercise supplemental jurisdiction over the state law claims.

On February 15, 2012, the Plaintiffs submitted opposition to the Defendants' motion. In addition to disputing that they had failed to plausibly allege causes of action under the DMCA and the first sentence of § 605(a) of the Communications Act, the Plaintiffs, for the first time, argued that they were also seeking to hold the Defendants liable under the third sentence of § 605(a) of the Communications Act. The Plaintiffs further argued that, even if the Court dismissed the federal claims, the state claims should not be dismissed because the Plaintiffs "may soon file a motion to amend the complaint which would include an allegation that this Court has diversity jurisdiction". (Pls.' Opp. at 25.) The Defendants submitted their reply brief in support of their motion to dismiss on February 29, 2012, disputing the propriety of the Plaintiffs' attempt to insert a new legal theory for the alleged violation of § 605(a) of the Communications Act, as well as the request that the Court not dismiss the state claims based on a potential future motion to amend the complaint.

The potential motion to amend became a reality a few weeks later on March 20, 2012, when the Plaintiffs filed a motion pursuant to Fed. R. Civ. P. 15(a) to amend the first amended complaint. The following facts from the above-stated case-description were new additions in the proposed second amended complaint: (1) the Court had diversity jurisdiction; (2) specific allegations with respect to which EchoStar receivers were associated with the Defendants' accounts; (3) further allegations that none of the Defendants were receiving DISH Network's signals at the only addresses authorized to receive signals and that the EchoStar receivers had been removed from the subject addresses that they were contractually associated with; (4) the Defendants' EchoStar receivers were fully integrated into the World Cable system; (5)

allegations pertaining to the recovery of the EchoStar receivers pursuant to the Court's seizure order, including the allegation that one receiver from the Rasul account was seized at the address listed on Sohail's first account, where it was not authorized; (6) the Defendants are either communications entities or the agents and/or employees of communications entities; (7) the Defendants with individual accounts were undisclosed agents or employees of World Cable; and (8) certain of the channels re-broadcast by the Defendants were channels which DISH Network exclusively distributes by IPTV in the United States. (Pls.' MTA Br. at 3–4.)

The proposed second amended complaint also asserted the following new causes of action: (1) allegations that the Defendants are liable under the second through fourth sentences of § 605(a) of the Communications Act; (2) a further count against World Cable, alleging violations of 47 U.S.C. § 605(a) based upon World Cable's re-broadcast of channels as to which DISH Network has the exclusive right to distribute through IPTV in the United States; (3) further counts against defendant Rasul alleging claims based upon fraud and breach of contract under New York state law; and (4) a further count against defendant Sohail, alleging a claim based upon fraud under New York state law.

Because an analysis of the Defendants' motion to dismiss the DMCA and Communications Act claims asserted in the first amended complaint is intertwined with an analysis of the Plaintiffs' motion to amend to add factual allegations to these claims, the Court will frame its analysis around the Plaintiffs' motion to amend. Thus, the Court addresses the legal arguments asserted in the Defendants' motion to dismiss the complaint in conjunction with the motion to amend futility analysis.

## II.  LEGAL STANDARDS

### A.  Legal Standard on a Motion to Amend

A motion to amend is governed by Fed. R. Civ. P. Rule 15(a), which states that leave to amend "shall be freely given when justice so requires."  A court should deny leave to amend only upon "undue delay, bad faith or dilatory motive on the part of the [moving party], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the [non-moving party,] ... [or] futility."  Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L.Ed.2d 222 (1962); see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603–04 (2d Cir. 2005).  Amendments are generally favored because "they tend to facilitate a proper decision on the merits."  Blaskiewicz v. Cnty. of Suffolk, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998).  However, it is ultimately "within the sound discretion of the court whether to grant leave to amend."  John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994) (citing Foman, 371 U.S. at 182, 83 S. Ct. 227).

In determining whether leave to amend should be granted, among the "most important" issues to consider is prejudice to the opposing party.  AEP Energy Services Gas Holding Co. v. Bank of America, N.A., 626 F.3d 699, 725 (2d Cir.2010) (internal quotations omitted).  "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."  State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir.1981) (granting leave to amend after discovery was closed, where there was no undue prejudice to the defendants and "no trial date had been set by the court and no motion for summary judgment had yet been filed by the defendants"); accord Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir.1993).

**B. Motion to Dismiss and Futility**

The Defendants have moved to dismiss the DMCA and Communications Act causes of action in the first amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim and seek the denial of the Plaintiffs' motion to amend these claims as futile. A proposed amendment is futile if the proposed claim could not withstand a Rule 12(b)(6) motion to dismiss. Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002). The Court therefore applies the Rule 12(b)(6) standard in deciding the Defendants' motion to dismiss and in assessing the futility of the DMCA and Communications Act causes of action in the proposed second amended complaint.

Under the now well-established Twombly standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). The Second Circuit has explained that, after Twombly, the Court's inquiry under Rule 12(b)(6) is guided by two principles. Harris v. Mills, 572 F.3d 66 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Id. (quoting Iqbal, 129 S. Ct. at 1949). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context–specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). Thus, "[w]hen

there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." Iqbal, 129 S. Ct. at 1950.

In considering a motion to dismiss, this Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the Plaintiffs' favor. Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990); In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir.2007). Only if this Court is satisfied that "the complaint cannot state any set of facts that would entitle the plaintiff to relief" will it grant dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993). The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

### III. APPLICATION

#### A. Whether the Plaintiffs Should be Permitted to Amend the Complaint to Add Additional State Law Claims Against Defendants Rasul and Sohail

The Plaintiffs seek to amend the complaint to allege that the Court has diversity jurisdiction over their state law claims, and to add state law causes of action for breach of contract against defendant Rasul and fraud against defendants Rasul and Sohail. The Defendants do not oppose the Plaintiffs' motion on this ground, and therefore the Court grants the Plaintiffs' motion to file a second amended complaint with respect these claims.

#### B. Whether the Plaintiffs Should Be Permitted to Amend the Complaint to Add Additional Factual Allegations in Support of their DMCA and Communications Act Claims

With respect to the proposed amendments to the causes of action for violations of the DMCA; the first sentence of § 605(a); and § 605(e)(4), the Defendants argue that the proposed amendments are futile because the proposed second amended complaint does not cure any of the

defects that warrant the dismissal of these claims as asserted in the first amended complaint. In addition, the Defendants contend that the Plaintiffs' arguments in support of their motion to amend these claims are not based on "new allegations", and therefore the motion to amend is properly characterized as an impermissible sur-reply to the Defendants' motion to dismiss. As a result, the Defendants contend that the Plaintiffs' motion was filed in bad faith to avoid the inevitable dismissal of their DMCA and Communications Act claims and that the Court should deny the motion to amend in the interest of justice.

Under the Supreme Court precedent in Foman, "a party's dilatory motive is a legitimate basis for a court's denying that party's motion to amend a pleading." Am. Med. Assoc. v. United Healthcare Corp., No. 00-CV-2800, 2006 WL 3833440, at *5 (S.D.N.Y. Dec. 29, 2006) (citing Foman, 371 U.S. at 182, 83 S. Ct. 227). "When it appears that leave to amend is sought in anticipation of an adverse ruling on the original claims ... the court is free to deny leave to amend." PI, Inc. v. Quality Prods., Inc., 907 F. Supp. 752 (S.D.N.Y. 1995) (citing Ansam Assocs., Inc. v. Cola Petroleum, Inc., 760 F.2d 442, 446 (2d Cir. 1985)).

The Plaintiffs readily admit that their motion to amend the complaint was "motivated by the Defendants' Motion to Dismiss". (Pls.' MTA Br. at 7.) Of this there can be no doubt, insofar as most of the additional allegations in the proposed second amended complaint were included in the motion for a TRO and therefore available to the Plaintiffs when they filed the initial complaint and/or were known to the Plaintiffs at least as early as December 1, 2011, after the Marshall's executed the seizure order. Therefore, these additional factual allegations could have, and the Court would argue, should have, been included in the first amended complaint filed on December 7, 2011. See Zubulake v. UBS Warburg LLC, 231 F.R.D. 159, 162 (S.D.N.Y. 2005) (noting that "'leave to amend may be denied where the moving party knows or should

have known of the facts upon which the proposed amendment is based, but failed to include them in the original pleading'") (citations omitted). The only facts that the Plaintiffs contend were unavailable to them at the time they filed the first amended complaint were those relating to World Cable's alleged distribution of the exclusive channels. However, the fact that DISH Network had the exclusive right to distribute certain of the subject channels has no bearing on whether the Defendants violated the DMCA or the Communications Act in gaining access to those channels.

In addition, the Court agrees that the Plaintiffs' arguments for why the proposed amendment of these claims would not be futile are either entirely new theories unrelated to the "new allegations", or a reemphasis of their previously stated arguments. Nevertheless, because the Court ultimately finds that, even considering the "new" allegations and arguments, the Plaintiffs cannot plausibly allege that the Defendants violated the DMCA or the first sentence of the § 605(a), the Court will address the Plaintiffs' new arguments in its discussion on the motion to dismiss.

**1. Whether the Plaintiffs State a Claim for Violations of the DMCA**

The DMCA was enacted by Congress in 1998 "to strengthen copyright protection in the digital age." Universal City Studios, Inc. v. Corley, 273 F.3d 429, 435 (2d Cir. 2001). The DMCA contains three sections. First, 17 U.S.C. § 1201(a)(1)(A) provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under [Title 17]". This subsection is commonly referred to as the "anti-circumvention" provision.

The second and third subsections are set forth in 17 U.S.C. § 1201(a)(2) and 1201(b)(1) respectively, and are commonly referred to as the "anti-trafficking provisions". Subsection 1201(a)(2), which is the anti-trafficking provision at issue in this litigation, makes it unlawful to

"manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof" that is "primarily designed or produced" or "marketed" to enable the circumvention prohibited by section 1201(a)(1). 17 U.S.C. § 1201(a)(2).

Both the anti-circumvention provision and the anti-trafficking subsections of section 1201(a) are aimed at conduct that "circumvent[s] a technological measure" in order to gain unauthorized access to a protected work. The DMCA defines circumvention as an action that intends "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner". 17 U.S.C. § 1201(a)(3)(A). In addition, the statute provides that "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B).

In this case, the Plaintiffs protect access to the subject channels through the conditional access system, which involves encrypting the satellite signals that contain the copyrighted programming. The authorized method for decrypting the encrypted signals was the use of the EchoStar receiver containing a NagraStar smartcard. DISH Network provided the EchoStar receivers to its paying subscribers, including a total of sixteen receivers that were provided to defendants Statewide, Sohail, Malik, and Rasul. There is no dispute that the conditional access system constituted a technological measure that "effectively controls access to a work" under the statute. Moreover, accepting the facts in the complaint as true, the Plaintiffs have plausibly alleged that the Defendants used the EchoStar receivers associated with the individual accounts

to gain access to the decrypted DISH Network signals, which they then re-broadcasted to the World Cable subscribers.

However, merely alleging that a defendant "accessed" a copyrighted work that is protected by a technological measure is not enough to state a claim for a violation of the DMCA. Rather, "[t]he plain language of the statute . . . requires a plaintiff alleging circumvention (or trafficking) to prove that the defendant's *access* was unauthorized." See Chamberlain Grp. v. Skylink Techs., Inc., 381 F.3d 1178, 1193 (Fed. Cir. 2004) (emphasis added).

Generally, when a satellite provider like DISH Network or DIRECTV brings a case alleging that a defendant violated the DMCA, it typically involves the use of a "pirate access device", such as decryption software, a descrambler, or a modified receiver and/or access card, which are used "to circumvent this conditional access technology and allow users to receive the satellite transmissions provided by [the satellite television provider] without paying [the satellite television provider] any fees". DIRECTV, Inc. v. Brown, 371 F.3d 814, 816 (11th Cir. 2004); see, e.g., DISH Network LLC v. Dillion, No. 12-CV-157, 2012 WL 368214, at *1 (S.D. Cal. Feb. 3, 2012) (identifying various methods for circumventing the DISH Network conditional access system including "loading software containing the proprietary data and keys to DISH's security system ('piracy software') onto circuit chips within unauthorized receivers, mimicking legitimate NagraStar smart cards" and "control word sharing" or "internet key sharing" which involves "a pirate computer server send[ing] descrambling codes (often extracted from a paid subscription) to internet end-users who have downloaded piracy software onto their receivers so that their receivers are programmed to receive the descrambling control words and utilize the control words to descramble DISH programming"); DISH Network, L.L.C. v. SatFTA, No. 08-CV-1561, 2011 WL 856268, at *3 (N.D. Cal. 2011) (granting summary judgment to DISH

Network on a DMCA claim against defendant who modified NagraStar smartcards to allow "him to bypass DISH Network's security measures and intercept its satellite programming").

However, in this case, the Plaintiffs do not allege that the Defendants used or sold a "pirate access device" to circumvent the conditional access system. Rather, the Plaintiffs allege that the Defendants used their EchoStar receivers as part of the World Cable re-broadcasting scheme to circumvent the conditional access system in violation of § 1201(a)(1)(A). In addition, the Plaintiffs allege that the Defendants sale of the World Cable service and the World Cable boxes to provide the re-broadcasted signals to their subscribers violated § 1201(a)(2).

### a. Whether the Plaintiffs Plausibly Allege that the Defendants Violated Section 1201(a)(1)(A)

In opposition to the motion to dismiss, the Plaintiffs argue that the re-broadcasting scheme did not permit the Defendants to circumvent the technological measure, but rather it "enable[d] the Defendants' World Cable subscribers to avoid or bypass the Plaintiffs' encryption which should have protected those signals". (Pls.' Opp. at 8.) In support of their motion to amend the complaint, the Plaintiffs take a completely different position, arguing that the Defendants themselves circumvented the encryption mechanism through fraud and deceit by misrepresenting that they intended to use their DISH Network accounts solely for residential or commercial viewing of the subject channels at the specific locations identified in their subscription agreements. As set forth below, under either theory, the Court finds that the Plaintiffs have failed to state a claim that the Defendants violated the anti-circumvention provision.

Section 1201(a)(1)(A), the anti-circumvention provision, "aims against those who engage in unauthorized circumvention of technological measures.... [It] focuses directly on wrongful conduct, rather than on those who facilitate wrongful conduct. . . ." Universal City Studios, Inc.

v. Reimerdes, 111 F. Supp. 2d 294, 319 (S.D.N.Y. 2000) (quoting 1 Nimmer § 12A.03[A], at

12A–15 (1999 Supp.)); Chamberlain Grp., 381 F.3d at 1195 (only defendants "who use

[circumvention devices] may be subject to liability under § 1201(a)(1)").  Thus, contrary to the

Plaintiffs' argument in opposition to the motion to dismiss, the Defendants cannot be liable

under § 1201(a)(1)(A) for the alleged circumvention by the World Cable subscribers.  See

Autodesk, Inc. v. Flores, No. 10-CV-1917, 2011 WL 337836, at *4 n.2 (N.D. Cal. Jan. 31, 2011)

("The FAC is focused on allegations that Defendants sold or trafficked in circumvention

technology and does not allege that they actually used the technology themselves.  Thus,

Autodesk does not appear to have pled a claim under § 1201(a)(1)(A).").

Similarly without merit is the Plaintiffs' argument in support of their motion to amend

that, because the Defendants utilized the EchoStar receivers at unauthorized locations and for

unauthorized purposes, the Defendants themselves circumvented the encryption mechanism by

obtaining access to the decrypted signals through "fraud and deceit".  Under the Plaintiffs logic,

any person who intends to engage in unauthorized redistribution when he purchases copyrighted

material would violate the anti-circumvention provision of the DMCA.

However, using deception to gain access to copyrighted material is not the type of

"circumvention" that Congress intended to combat in passing the DMCA.  In enacting the

DMCA, Congress sought to punish the conduct of those people who "will try to profit from the

works of others by decoding the encrypted codes protecting copyrighted works, or engaging in

the business of providing devices or services to enable others to do so."  H.R. Rep. No. 105–551,

pt. 1, at 10 (1998).  As the Second Circuit has explained, the DMCA is aimed at protecting "the

efforts of copyright owners to protect their works from piracy behind *digital walls* such as

encryption codes or password protections".  Universal City Studios, Inc. v. Corley, 273 F.3d 429, 435 (2d Cir. 2001) (emphasis added).

Here, while the Defendants alleged fraud may have circumvented contractual barriers to receiving the signal, there are no facts in the first amended complaint from which the Court can infer that they circumvented the "digital walls" that protected the copyrighted works.  In addition, while the Plaintiffs emphasize that the EchoStar receivers associated with the Defendants' individual accounts were removed from their authorized location, the Plaintiffs do not allege in either complaint that there was any technological measure in place to prevent their signals from reaching EchoStar receivers that were located at unauthorized addresses.  Thus, there is no basis from which the Court can infer that simply moving the EchoStar receiver to an unauthorized location avoided or bypassed a "digital wall", as opposed to a contractual restriction.

The Plaintiffs attempt to rectify this deficiency in the proposed second amended complaint by adding an allegation that the EchoStar receivers associated with the Defendants' individual accounts were "fully integrated" into the World Cable system, where they were then "used in real-time to decrypt signals to the World Cable subscribers; thus circumventing the Plaintiffs' encryption by, among other things, bypassing or removing DISH's Encryption that should have protected the signals".  (PSAC, ¶ 101.)  However, the Plaintiffs do not allege that being "fully integrated" into the World Cable system altered or interfered with the normal process by which the EchoStar receiver and NagraStar smartcard decrypted the signal.  At most, the Plaintiffs have alleged that, by integrating the EchoStar receivers into the World Cable system, the Defendants were able to effectuate a more seamless re-broadcasting of the decrypted

signal. However, the Second Circuit has clearly held that "the DMCA does not concern itself with the use of [protected] materials after circumvention has occurred". Corley, 273 F.3d at 443.

By way of analogy, Congress explained that: "The act of circumventing a technological protection measure put in place by a copyright owner to control access to a copyrighted work is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." H.R. Rep. No. 105–551, pt. 1, at 17 (1998). In this case, the room was already unlocked, and therefore the Defendants did not have to "break in" to gain access to the copyrighted work. While lying to convince the Plaintiffs to open the door and then stealing, copying, and selling the content of the books inside the room may violate other laws, they do not violate the DMCA.

Furthermore, even assuming that the use of deception to obtain the EchoStar receivers meant that the Defendants' *use* of those receivers to decrypt the signals was without permission, it does not necessarily follow that the Defendants *access* to the decrypted signals was unauthorized. In the context of the DMCA, courts have interpreted "authorized" access to mean the use of the normal process or the intended mechanism for obtaining the copyrighted work. I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc., 307 F. Supp. 2d 521, 532–33 (S.D.N.Y. 2004) (holding that the DMCA anticipated circumvention of a "technological measure *qua* technological measure", and therefore simply bypassing "*permission* to engage and move through the technological measure from the measure's author" did not fall within the statutory definition of circumvention and therefore because the defendant "did not surmount or puncture or evade any technological measure" but instead "used a password intentionally issued by plaintiff to another entity," there was no "circumvention" under section 1201(a)(1)); see also R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d 878, 889 (N.D. Ohio 2009) (holding that a defendant does not "circumvent or bypass any technological measure" when he uses "the

approved methodology . . . to access the [copyrighted material]".); Egilman v. Keller & Heckman, LLP., 401 F. Supp. 2d 105 (D.D.C. 2005) ("[T]he authorized *use* of a technological measure does not constitute circumvention for purposes of the DMCA.").

The Plaintiffs cite to Actuate Corp. v. International Business Machines Corp., No. 09-CV-5892, 2010 WL 1340519 (N.D. Cal. April 5, 2010), for the proposition that the unauthorized use of a "low-tech methodology"—namely, a password or, in this case, "fraud and deceit"—to avoid or bypass a technological measure can constitute "circumvention" under the DMCA. The Court finds the holding in Actuate to be unpersuasive insofar as that decision defined "authorized" based on the type of access (with or without permission), not the method of access (the intended or unintended mechanism). See Actuate, 2010 WL 1340519, at *9 (holding that the use of passwords "without authorization" is no different than the unauthorized use of other technologies to gain access to copyrighted material, and therefore it "avoids and bypasses a technological measure in violation [of the DMCA]").

This rationale contravenes the plain language of the statute, which is focused on the method of entry. As one court explained, the use of the words "avoid" and "bypass" in the statute, "as well as the remainder of the words describing circumvent, imply that a person circumvents a technological measure only when he *affirmatively performs an action* that disables or voids the measure that was installed to prevent them from *accessing* the copyrighted material." Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey, 497 F. Supp. 2d 627, 644 (E.D. Pa. 2007) (emphasis added); see also Egilman, 401 F. Supp. 2d at 113 ("Circumvention, as defined in the DMCA, is limited to actions that 'descramble,' 'decrypt,' 'avoid, bypass, remove, deactivate or impair a technological measure.' 17 U.S.C. § 1201(a)(3). What is missing from this statutory definition is any reference to 'use' of a technological

measure without the authority of the copyright owner, and the court declines to manufacture such language now.").

Thus, even assuming that the Defendants gained access to the DISH Network signals through "fraud and deceit", the Defendants use of the normal process to decrypt the satellite signal did not avoid or bypass the conditional access system because they used the intended mechanism—the EchoStar receiver and NagraStar smart card—in precisely the manner in which they were designed to function. The fact that the Defendants may have used the EchoStar receivers and NagraStar smartcards at an unauthorized location for an unauthorized purpose is irrelevant because "circumvention" is explicitly limited to the actions listed in § 1201(a)(3)(A). Therefore, although stealing an EchoStar receiver or a password may enable unauthorized re-broadcasting of the copyrighted material, it does not "circumvent" the "technological measure" controlling access the works.

Accordingly, the Court finds that the Plaintiffs have failed to plausibly allege in both the first amended complaint and the proposed second amended complaint that the Defendants violated the anti-circumvention provision of the DMCA. Thus, the Court grants the Defendants' motion to dismiss and denies the Plaintiffs' motion to amend the causes of action for violations of § 1201(a)(1)(A) of the DMCA.

**b. Whether the Plaintiffs Plausibly Allege that the Defendants Violated Section 1201(a)(2) of the DMCA**

The Defendants seek to dismiss the anti-trafficking claims on the grounds that the Plaintiffs have failed to allege that they sold or marketed a product that enables circumvention. The Plaintiffs do not dispute that the World Cable service and World Cable boxes did not actually decrypt the DISH Network signals. Rather, the Plaintiffs contend that "[t]he World Cable boxes

were an integral part of the Defendants' re-broadcasting scheme". (Pls.' Opp. at 10.) This argument reflects a fundamental misunderstanding of the anti-trafficking provision.

In contrast to the anti-circumvention provision that prohibits direct circumvention, the relevant anti-trafficking provision, section 1201(a)(2) "separately bans offering or providing technology that may be used to circumvent technological means of controlling access to copyrighted works." Universal City Studios, Inc. v. Reimerdes, 111 F. Supp. 2d 294, 319 (S.D.N.Y. 2000) (citing 1 Nimmer § 12A.03[B], at 12A–25 to 12A–26). To state a claim under the anti-trafficking provision that a service or product was "primarily designed or produced for the purpose of circumventing a technological measure", the Plaintiffs must allege that the Defendants trafficked in a product or service that *enabled* the circumvention, not access to what has already been obtained. As explained by the House Judiciary Committee:

> The Committee believes it is very important to emphasize that Section 102(a)(2) is aimed fundamentally at outlawing so-called "black boxes" that are expressly intended *to facilitate circumvention* of technological protection measures for purposes of gaining access to a work. . . .

(emphasis added). Thus, as Congress made clear, the devices targeted under § 1201(a)(2) were not those that facilitated the distribution of unlawfully received copyrighted material, but rather those devices or services that actually performed the circumvention.

The Plaintiffs rely on CoxCom, Inc. v. Chaffee, 536 F.3d 101 (1st Cir. 2008) for the proposition that, even where the content is decrypted using the approved methodology, using a device or service to gain unauthorized access to the content constitutes circumvention. In CoxCom, the technological measure protecting the plaintiff's transmission of copyrighted pay-per-view movies was "CoxCom's pay-per-view delivery and billing system that scrambles pay-per-view programming unless subscribers choose to purchase and view it". Id. at 110. The

defendant in CoxCom sold a digital cable filter that the plaintiff's subscribers could place into their cable boxes to block the transmission of the return signal that indicated to CoxCom that the subscriber had viewed a pay-per-view movie. In affirming the district court's decision granting summary judgment to the plaintiff on the DMCA claim, the First Circuit summarily stated that "[a] digital cable filter allows subscribers to 'avoid' or 'bypass' that technological measure", and therefore the sale of such a device violated section 1201(a)(2). Id.

This case is distinguishable from the instant on multiple levels. First, in CoxCom the technological measure controlling access to the work was the entire delivery and billing process, which provided conditional access that could be revoked or result in a penalty for the subscriber if payment was not received. The Defendants in this case, unlike the defendants in CoxCom, did not interfere with the normal process by which the Plaintiffs transmitted their signal and received payment for its service. Although the Plaintiffs may have been entitled to payment for their copyrighted content that was provided to the World Cable subscribers, the Plaintiffs do not allege that there was a *technological* measure in place that the Defendants circumvented in order to prevent the Plaintiffs from receiving this information. In most cases, when a defendant distributes a copyrighted work without authorization, he is by definition denying the copyright holder or licensee their due compensation. While such a defendant may be liable for other violations of copyright or common law, he is not liable for circumventing a technological measure under the DMCA.

Furthermore, in CoxCom, the devices actually gave the purchasers, not the defendant sellers, the ability to directly circumvent the technological measure. Although they may have done so in part for the benefit of the World Cable subscribers, the Plaintiffs allege that the Defendants, not the World Cable subscribers, circumvented the conditional access system

through fraud and deceit. Nevertheless, even assuming that the Defendants circumvented the conditional access system to obtain the copyrighted works, the World Cable subscribers cannot be held liable for circumvention merely because the subject channels "would have been subject to a technological measure that would have controlled [their] access to [the copyrighted content]". MGE UPS Sys., Inc. v. GE Consumer and Indus., Inc., 622 F.3d 361, 366 (5th Cir. 2010). As the Sixth Circuit has persuasively noted, "[s]o broad a construction would extend the DMCA beyond its intended purposes to reach extensive conduct already well-regulated by existing copyright laws." Id.

Accepting the facts in the first amended complaint and the proposed second amended complaint as true, the Plaintiffs have plausibly alleged that the Defendants' products and services allowed the World Cable subscribers to benefit from the Defendants' alleged misconduct. However, the Plaintiffs have failed to allege any facts from which the Court can infer that the World Cable service or the World Cable boxes actually enabled the World Cable subscribers to circumvent the conditional access system. Thus, the Court grants the Defendants' motion to dismiss and denies the Plaintiffs' motion to amend the causes of action for violations of section 1201(a)(2) of the DMCA.

### 2. Whether the Plaintiffs State a Claim in the First Amended Complaint for Violations of Sections 605(a) of the Communications Act

In the first amended complaint, the Plaintiffs assert that the Defendants' alleged re-broadcasting scheme violated the first sentence of § 605(a) of the Communications Act and that selling the World Cable boxes to effectuate this scheme violated § 605(e)(4) of the Communications Act. The Defendants move to dismiss these causes of action and seek the denial of the Plaintiffs' motion to amend these claims on the ground that, because the Defendants

are not "communications personnel", they cannot be held liable under either provision of the statute.

The first sentence of Section 605(a) provides:

> Except as authorized ... no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers or various communication centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena [sic] issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.

47 U.S.C. § 605(a) (1991).

Although not explicitly stated in the statute, courts have interpreted the first sentence of § 605(a) as being "intended to regulate the conduct of communications personnel— i.e., those legitimately involved in transmitting or receiving radio or wire communications—rather than to address the problem of unauthorized interception or reception of communications." Int'l Cablevision, Inc. v. Noel, 859 F. Supp. 69, 75 (W.D.N.Y. 1994) (interpreting the legislative history of the Communications Act) (emphasis in original), vacated on other grounds, 75 F.3d 123, 131 n. 4 (2d Cir. 1996) ("The first sentence of § 605(a) is probably directed at communications personnel, as the district court indicated in Noel."); Gen. Steel Contractors, Inc. v. Ortez, No. 05-CV-87, 2007 WL 214454, at *4 (W.D. Ky. Jan. 24, 2007) ("[T]he legislative history of this section demonstrates that the first sentence of section 605(a) applies to legitimate communications personnel, as opposed to those engaged in the unauthorized interception of wire or radio communications." (quoting Gen. Instrument Corp. v. NuTek Elecs. & Mfg., Inc., No.

93-CV-3854, 1996 WL 402511, at *4 (E.D. Pa. Apr. 12, 1996)).  Thus, courts have held that "although any person may violate the prohibitions of the second, third, and fourth sentences of Section 605(a), only legitimate communication personnel may violate the prohibitions of the first sentence."  Joe Hand Promotions, Inc. v. Rennard Street Enters., Inc., 954 F. Supp. 1046, 1052 (E.D. Pa. 1997).

Despite the above-stated precedents, the Plaintiffs contend that the "communications personnel" requirement is not applicable insofar as  "numerous courts have found that when owners/managers of bars, nightclubs, or restaurants utilize signals in commercial facilities that are only authorized for residential viewing, those activities violate both the first sentence and the third sentence of § 605(a)."  (Pls.' Opp. at 17.)  However, the parties in the cases cited by the Plaintiffs did not appear to raise the issue of whether a non-communications personnel defendant could be liable under the first sentence of § 605(a), and therefore the issue was not directly addressed by the court.  See, e.g., DIRECTV, Inc. v. Ferri, No. 08-CV-122, 2009 WL 4406052 (W.D.N.C. Nov. 25, 2009) (holding that a bar owner authorized to receive satellite transmissions for residential use was liable under the first and third sentences of § 605(a) for broadcasting the satellite transmissions at his bar for commercial benefit without any reference to "communications personnel"); That's Entertainment, Inc., v. J.P.T., 843 F. Supp. 995 (D. Md. 1993) (same).  In fact, in one of the cases cited by the Plaintiffs, DIRECTV, Inc. v. Walls, Bo. 08-CV-605, 2009 WL 2255289 (S.D. Ohio July 27, 2009), the court held that the defendant bar owner who falsely registered for a residential instead of a commercial subscription was liable under the third sentence, not the first sentence of section 605(a).

In contrast to the cases cited by the Plaintiffs, the Defendants cite to a case that directly addressed the liability of a bar owner under the first sentence of § 605(a), Kingvision Pay Per

View, Ltd. v. Duermeier, 24 F. Supp. 2d 1179 (D. Kan. 1998), which held that the defendant bar owner who was authorized to receive only residential cable service was not "communications personnel" and therefore "[could not] be liable under the first sentence of § 605". Id. at 1183.

The Plaintiffs argue that, even assuming their first amended complaint is subject to dismissal for failing to allege that the Defendants are "communications personnel", they should be permitted to amend their complaint to include the allegation that the Defendants, who are engaged in the distribution of television programming through the IPTV system, are "communications personnel". To support this argument, the Plaintiffs cite to National Satellite Sports, Inc. v. Time Warner Entertainment Co. L.P., 217 F. Supp. 2d 466 (S.D.N.Y. 2002), where Time Warner, a television distribution company that was only authorized to broadcast a pay-per-view event to residential subscribers satellite signal, was held liable under the first sentence of section 605(a) for unknowingly transmitting the event to a commercial establishment. Even accepting that Time Warner and World Cable are comparable entities, there is a critical difference between the facts in National Satellite Sports and the instant case, namely that Time Warner was authorized to received the satellite signal in its capacity as a communications entity.

The fact that an authorized recipient also happens to work in the communications industry does not necessarily create liability under the first sentence of § 605(a). Rather, the relevant inquiry is whether the person authorized to receive the signal was authorized to do so in their capacity as an "intermediary". See Nat'l Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 913 (6th Cir. 2001) ("In particular, the prohibition in the first sentence of § 605(a) does not involve the interception of a communication at all. It prohibits intermediaries who are authorized to receive a communication by wire or radio from divulging the contents of the

transmission to any person other than the addressee intended by the sender."); see id. ("An authorized intermediary of a communication (such as Time Warner) violates the first sentence of § 605(a) when it divulges that communication through an electronic channel to one "other than the addressee" intended by the sender (such as Main Events)."); Joe Hands Promotions v. D.M.B. Ventures, Inc., Nos. 93-CV-2656, 93-CV-3141, 1995 WL 328399 (E.D. La. May 31, 1995) (holding that Cox Cable, a communications company authorized to distribute a boxing match to its residential customers by an event promoter, violated the first sentence of § 605(a) when it broadcasted the event to several commercial establishments that had falsely obtained residential service from Cox Cable).

Although it was not resolved on the merits and therefore has no precedential value, the Court notes that one of the cases cited by the Plaintiffs in their motion for a TRO to support liability under the first sentence of § 605(a) similarly involved defendant communications companies with a contractual relationship to the satellite signal provider. See Madison Square Garden, L.P. v. Telestar Systems, Inc., No. 02-CV-2080 (E.D.N.Y. 2002) (plaintiffs, telecommunications entities who operated sports channels alleged that defendant, a Satellite Master Antenna Television system operator with whom it had a contractual agreement that permitted the defendant to distribute certain of its channels, violated the first sentence of § 605(a) because it re-broadcast the plaintiffs' signals to additional subscribers without the plaintiffs' authorization).

Thus, even assuming that the Defendants are properly classified as "communications personnel", the Plaintiffs have not alleged that the Defendants were authorized as intermediaries to receive or transmit the DISH signal. Accordingly, the Court grants the Defendants motion to dismiss the Plaintiffs' cause of action alleging that the Defendants violated the first sentence of

section 605(a).  In addition, because permitting the Plaintiffs to amend the complaint to assert additional allegations regarding the Defendants' liability under the first sentence of § 605(a) would be futile, the Court denies the Plaintiffs' motion to amend this claim.

### 3.  Whether the Plaintiffs Should be Permitted to Amend their Communications Act Claim

The Defendants contend, and the Court agrees, that the causes of action for violations of the second through fourth sentences of the § 605(a) are newly asserted in the proposed second amended complaint.  Thus, the Court addresses the Plaintiffs' claims under these provisions for futility.

The second sentence of § 605(a) provides:

> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

The third sentence of § 605(a) provides:

> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

Finally, the fourth sentence of § 605(a) provides:

> No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a).

In addition, the Plaintiffs also allege that the Defendants violation Section 605(e)(4) of the Communication Act which proscribes the sale and/or distribution of satellite piracy devices, which provides:

> Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both. For purposes of all penalties and remedies established for violations of this paragraph, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation

47 U.S.C. § 605(e)(4).

Although this claim was asserted in the first amended complaint, because the Court found that the first amended complaint did not state a claim for a violation of § 605(a), the Court addresses it in the context of the Plaintiffs motion to amend.

First, the Court finds that permitting the Plaintiffs to amend their complaint to assert violations of the second and fourth sentences of § 605(a) would be futile. The second and fourth sentences of § 605(a) indisputably require an "interception". Contrary to the Plaintiffs' arguments, the Court finds that they have failed to allege that the Defendants "intercepted" the DISH signal.

"[T]he term 'intercept' or 'interception' means to stop, seize, or interrupt prior to arrival; or taking or seizing before arrival at the destined place." Premium Sports Inc. v. Connell, 2012 WL 691891, at *2 (S.D.N.Y. March 1, 2012) (citing Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); Goldman v. United States, 316 U.S. 129, 134, 62 S. Ct. 993, 86 L. Ed. 1322 (1942)). Although some courts have held that the removal of a receiver from a

residential to a commercial location constitutes "interception", those cases are distinguishable because the relocation was actually necessary to effectuate the unauthorized distribution of the signal.

In this case, the Court fails to see how it matters whether the boxes were located at their intended addresses or some other location when they allegedly re-transmitted the signal to the World Cable server. The Plaintiffs have not alleged that the physical location of the Echostar Receiver had any bearing on what was done after the signal was received. Thus, the fact that the Defendants may have removed the EchoStar receivers associated with the individual accounts from the locations associated with those accounts does not constitute an "interception" under the Communications Act. Accordingly, the Court finds that permitting the Plaintiffs to amend their complaint to add claims for violations of the second and fourth sentences of § 605(a) of the Communications Act would be futile, and therefore denies their motion to amend on this ground.

With respect to the third sentence of § 605(a), the Defendants argue that permitting the Plaintiffs to amend the complaint to assert a claim under this provision would be futile because the Plaintiffs have not plausibly alleged that the Defendants "intercepted" the satellite signal. The Court is aware that some cases have held that, similar to the second sentence, the third sentence of § 605(a) also requires an interception. See, e.g., Premium Sports, Inc., 2012 WL 691891, at *2 ("The critical and dispositive legal point is that in order for there to be a violation of 47 U.S.C. § 605(a), there must be an "interception" of a signal or transmission."); Nat'l Basketball Ass'n v. Sports Team Analysis & Tracking Sys., Inc., 939 F. Supp. 1071, 1114 (S.D.N.Y.1996), ("The third sentence, contrary to the unsupported assertion from J.P.T., Inc. upon which NBA relies, similarly requires an interception and is inapplicable."), rev'd in part on other grounds sub nom. Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841 (2d Cir. 1997).

However, the vast majority of cases have persuasively held that "[s]ection 605(a) prohibits much more than just the unauthorized interception of signals." That's Entertainment v. Centel Videopath, No. 93-CV-1471, 1993 WL 13011588, at *7 (N.D. Ill. Dec. 9, 1993) see also Joe Hand Promotions, Inc. v. That Place, LLC, No. 11-CV-931, 2012 WL 2525653, at *3 (E.D. Wis. June 29, 2012) ("While the second and fourth sentences of § 605(a) require both an unauthorized 'interception' and a divulgence of the transmission in order to establish liability under the Act, the first and third sentences of § 605(a) do not similarly require an 'interception' and simply proscribe the unauthorized divulgence or use of communications which have been 'received' legally for certain purposes."); J & J Sports Productions, Inc. v. 4326 Kurz, Ltd., No. 07-CV-3850, 2009 WL 1886124, at *7 (E.D. Pa. June 30, 2009) (holding that section 605(a) prohibits "divulging transmission of a satellite communication to unauthorized persons, even after lawfully receiving the communication"); Kingvision Pay Per View, Ltd. v. Williams, 1 F. Supp. 2d 1481, 1484 (S.D. Ga.1998) ("Although Williams admits that she displayed the boxing match to her establishment's patrons, her Answer claims as a defense that she paid for the boxing match on a pay-per-view basis. This does not, however, relieve her from liability. While she may not have illegally intercepted the satellite signal, she was not authorized to display it to her establishment's patrons."); That's Entertainment v. Old Bridge Tavern, No. 94-CV-2612, 1996 WL 148045, at *2 (N.D. Ill. March 28, 1996) ("Even if there was no circumstantial evidence that Old Bridge intercepted the signal, there is direct evidence that defendant broadcast the transmission which is enough to violate the statute."); Joe Hands Promotions v. D.M.B. Ventures, Inc., No. 93-CV-2656, 1995 WL 328399, at *2–3 (E.D. La. May 31, 1995) ("The first sentence of Section 605(a) was intended to regulate the conduct of those persons legitimately involved in transmitting or receiving radio and wire communications." . . . "The third sentence of

Section 605(a) also applies to persons who assist in the transmission of radio communications.");

That's Entertainment, Inc. v. J.P. T., Inc., 843 F. Supp. 995, 999 (D. Md. 1993) ("While

defendants are correct in pointing out that the second sentence of Section 705(a) of the Act

requires both an unauthorized 'interception' and a divulgence of a cable television transmission

in order to establish liability under the Act . . .the first and third sentences of Section 705(a) do

not similarly require an 'interception' of a cable transmission and clearly proscribe the

unauthorized divulgence or use of communications which have been 'received' legally for

certain purposes.").

This is consistent with the purpose of the statute. As the Sixth Circuit has noted:

> In view of [promoting the growth of satellite programming and
> facilitating individual reception of unencrypted satellite signals],
> Congress amended the Communications Act to authorize the
> receipt of unscrambled satellite programming for private viewing[,
> w]hile *leaving intact the prohibitions against unauthorized use of
> radio or wire communications contained in 47 U.S.C. § 605(a).*

Nat'l Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 913 (6th Cir. 2001) (quoting Loschiavo

v. City of Dearborn, 33 F.3d 548, 551 (6th Cir. 1994)) (emphasis added in Eliadis); see also

Sioux Falls Cable Television v. State of S.D., 838 F.2d 249, 259 (8th Cir. 1988) (McMillian, J.,

dissenting) ("Congress in § 605(a) has expressly prohibited the unauthorized reception of cable

television programming. An individual or entity, no matter how laudable the motives, may not

receive or retransmit cable services without authorization unless the receipt of the services comes

within the private viewing exception of 605(b)."); California Satellite Sys. v. Seimon, 767 F.2d

1364, 1366 (9th Cir. 1985) ("Enacted in 1934, section 605 was aimed at preventing the

unauthorized use of radio signals by those authorized to transmit these signals *as well as those

not involved in authorized transmission.*") (emphasis added).

The Plaintiffs have alleged that the Defendants with individual accounts received the DISH signal containing the subject channels and divulged the satellite signal to World Cable and the World Cable subscribers, which were not authorized to receive the subject channels, for financial gain. These facts plausibly allege that the Defendants violated the third sentence of § 605(a). Accordingly, the Court grants the Plaintiffs' motion to amend the complaint to assert a cause of action for the Defendants' violation of the third sentence of § 605(a) of the Communications Act.

Finally, the Plaintiffs allege that the sale of the World Cable boxes violated § 605(e)(4) because they were used for the receipt of unauthorized satellite signals in violation of § 605(a). At this stage of the litigation, the Court must accept the Plaintiffs' assertions about the underlying technology as true. Thus, drawing all inferences in favor of the Plaintiffs, the Court cannot say that, as a matter of law, the sale of the World Cable boxes were not "intended" for an activity prohibited by § 605(a). Accordingly, the Plaintiffs' motion to amend to assert a violation of § 605(e)(4) is granted.

As a final matter, the Court notes that this ruling is premised on the Plaintiffs allegations that the Defendants actually engaged in a rebroadcasting of their signal. To the extent discovery reveals that the technology utilized by the Defendants did not involve the transmission of the original signal, or was more akin to copying content, the Communications Act may not be applicable. See Zuffa, LLC v. Justin.tv, Inc., 838 F. Supp. 2d 1102, 1107 n.5 (D. Nev. 2012) ("This is technologically a very different act than that committed in the cases cited by Zuffa [for violations of § 605(a)] where business proprietors actually extended the point of distribution of the actual broadcast signal distributed over a cable (or satellite) system beyond its authorized limits. . . . . Here, the allegations are that a copy of the signal was made after the signal

terminated at some device. This both changes what the signal is, how it is being distributed, and removes it from the point of distribution relevant to the statute.").

## IV.  CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendants' motion to dismiss the DMCA causes of action pursuant to Rule 12(b)(6) is GRANTED and the Plaintiffs' cross-motion to amend these claims is DENIED, and it is further

**ORDERED**, that the Defendants' motion to dismiss the cause of action alleging violations of the first sentence of § 605(a) of the Communications Act is GRANTED, and the Plaintiffs' cross-motion to amend this claim is DENIED, and it is further

**ORDERED**, that the Plaintiffs' motion to amend the complaint to allege that the Court has diversity jurisdiction over their state law claims, and to add state law causes of action for breach of contract against defendant Rasul and fraud against defendants Rasul and Sohail is GRANTED, and it is further

**ORDERED**, that the Plaintiffs' motion to amend the complaint to assert a cause of action for the Defendants' violation of the second and fourth sentences of § 605(a) of the Communications Act is DENIED, and it is further

**ORDERED**, that the Plaintiffs' motion to amend the complaint to assert causes of action for the Defendants' violations of the third sentence of § 605(a) of the Communications Act and § 605(e)(4) of the Communications Act is GRANTED.

**SO ORDERED.**
Dated: Central Islip, New York
September 28, 2012

___/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge